UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Robert Francis Howard, | File No. 20-cv-1004 (ECT/LIB) |
| Plaintiff, | |
| v. | **OPINION AND ORDER** |
| Ben Weidemann, *Badge #820*, and Brandon Meyer, *Badge #806*, each in his individual capacity acting under color of law as a White Earth Tribal Police Officer, | |
| Defendants. | |

Peter J. Nickitas, Minneapolis, MN, for Plaintiff Robert Francis Howard.

Vanya Hogen and Peter Rademacher, Hogen Adams PLLC, St. Paul, MN, for Defendants Ben Weidemann and Brandon Meyer.

In this case brought under 42 U.S.C. § 1983, Plaintiff Robert Francis Howard seeks damages stemming from an allegedly unlawful seizure and excessive use of force that occurred during a traffic stop on the White Earth Reservation. Defendants Ben Weidemann and Brandon Meyer were White Earth Tribal Police Department officers. Weidemann initiated the at-issue traffic stop, and Meyer arrived and participated mid-stop. Defendants have moved for summary judgment, and the motion will be granted. There is no genuine dispute that Weidemann and Meyer acted under color of tribal law when they carried out the stop—but not under color of state law, as § 1983 requires. If that weren't so, the officers would be entitled to qualified immunity. Finally, Howard did not give Defendants fair notice of *Bivens* claims that he first raised in his brief opposing their motion.

I[1]

Howard lives in Spirit Lake, Minnesota, and is an enrolled member of the White Earth Band of Ojibwe. ECF No. 55-1 at 3–4. Howard is an honorably discharged veteran of the United States Army who suffers from a "permanent, service-connected hearing disability that necessitates the use of hearing aids." *Id.* at 4. He also suffers from diabetes and coronary artery disease. *Id.* at 4–5. At all relevant times, Weidemann and Meyer were employed by the White Earth Tribal Police Department–Weidemann as a patrol officer, ECF No. 35 at 1, and Meyer as a sergeant, ECF No. 36 at 1.

On April 27, 2018, Howard was driving on a county highway in the White Earth Reservation. Weideman observed Howard's vehicle while he patrolled traffic in a marked White Earth Tribal Police Department vehicle. *See* ECF No. 35-2. Weidemann's radar clocked Howard's speed at 43 miles-per-hour in a 30-mile-per-hour zone. ECF No. 37-1 at 2. Weidemann activated his vehicle's emergency lights and sirens and began trailing Howard. ECF No. 35-2 at 0:15. Howard continued driving, made one right turn, and then a left turn into a parking lot. Just over one minute after Weidemann activated his lights

---

[1] The material events were captured on videos recorded by Defendants' body cameras and by a camera mounted on the dashboard of Weidemann's squad car. Neither side has questioned the authenticity of these videos, and each has filed portions of them as exhibits in connection with the instant motion. Thus, the facts are drawn largely from this video evidence, including when it "quite clearly contradicts the version of the story told by [Howard]." *Scott v. Harris*, 550 U.S. 372, 378–81 (2007); *accord Wallingford v. Olson*, 592 F.3d 888, 892–93 (8th Cir. 2010) (reversing denial of summary judgment on qualified immunity grounds when "videotape conspicuously refute[d] and completely discredit[ed] [plaintiff]'s version of the material facts upon which she base[d] her excessive force claim").

and sirens, Howard parked his car in front of a post office. *Id.* 0:46–1:28. Weidemann stopped his vehicle a short distance behind Howard's.

After parking, Howard began to exit his car, and Weidemann twice shouted at him to remain inside the vehicle. Howard stood up and looked in the direction of Weidemann's marked car, with its emergency lights still activated, before turning around and walking toward the post-office entrance. *Id.* 1:29–33. Weidemann, dressed in uniform, approached Howard and again told him to remain in the car. Howard turned and faced Weidemann. Weidemann instructed Howard to remain in his vehicle because he was "pulling him over." Howard again turned away and stepped toward the post office's entrance.

Weidemann then took hold of Howard by the left shoulder and forearm and guided him to the driver's side of Howard's car. Howard stated that he was "going inside," to which Weidemann responded: "Let me talk to you here." Howard asked: "Who the fuck are you?" Weidemann replied: "I'm going to put you in handcuffs, that's who I am." As Weidemann began handcuffing him, Howard responded "oh, okay." Seconds later, and just after Weidemann instructed Howard to place his arms behind his back, Howard jerked his right arm forward. *Id.* 1:33–58. Weidemann regained control of Howard's right arm as he stood directly behind him, pressing Howard against Howard's car, and finished placing him in handcuffs.

Weidemann stepped back and asked Howard: "What's wrong with you? How come you don't listen to me?" Howard responded: "Who are you?" Weidemann then identified himself as "Officer Weidemann, White Earth P.D." Weidemann again asked Howard why he was not responding to commands and whether he was on any medications. Howard

3

alternated between displaying confusion and responding, "okay." In response to Weidemann's repeated questioning, Howard responded that he was not taking medication and that he had not consumed any alcohol. Weidemann asked Howard why he could smell alcohol and how long it had been since Howard last consumed it. Howard responded that it had been about five years. *Id.* 2:17–37. Weidemann next asked Howard for his identification. Howard responded that it was "in [his] pocket." Weidemann turned Howard around and removed the wallet from his back pocket. Meanwhile, Howard volunteered that he'd "just come to get [his] mail."

Weidemann led Howard back to his squad car while grasping his right arm. *Id.* 2:37–3:00. Weidemann tried to maneuver Howard into the back seat of the squad car. Resting on the edge of the seat, Howard responded that he "[couldn't] get in" with the handcuffs on. Weidemann responded that Howard could "sit sideways in the seat," to which Howard responded, "okay." Howard paused for a few seconds and said, "Listen, why don't you call your boss?" Weidemann explained that he did not need his boss's permission to stop and detain Howard. Weidemann raised Howard's left leg, which was hanging out of the squad car, and placed it inside the vehicle. As Weidemann did so, Howard stated, "I'm going to sue you, fucker." ECF No. 37-3 at 1:55–2:40.

With Howard secured in the back seat of the squad car, Weidemann sat in the driver's seat and began running a check on Howard's driver's license. While he waited for information, Weidemann asked Howard, "How's your hearing?" Howard did not respond. Weidemann asked Howard if he was "okay" and whether he "need[ed] an ambulance."

4

Howard did not respond, and Weidemann continued running his check on Howard's driver's license. *Id.* 3:58–5:15.

Less than three minutes after securing Howard in the squad car, Weidemann asked Howard whether he would follow commands if Weidemann removed the handcuffs. After no audible response, Weidemann tried to get Howard's attention, though evidently without success. *Id.* 5:23–35. About one minute later, Howard volunteered from the squad car's back seat, "you got me, I'm drinking." Howard added that he would like to "take a test on that." Weidemann asked Howard whether he was willing to take any field sobriety tests. *Id.* 6:20–50.

Weidemann exited the squad car and asked Howard to step out so that he could remove the handcuffs. Howard responded that he could not move, and Weidemann helped Howard out of the car. Then, for the first time, Howard informed Weidemann that he had a hearing disability. ECF No. 37-4 at 0:00–53. Howard sat up with his left leg resting outside the car. Weidemann tried to pull Howard's right leg out, but it became lodged against the rear of the driver's seat. With encouragement from Weidemann, Howard began trying to free his right leg on his own. Howard again asked Wiedemann who he was and stated that he would like to speak with Weidemann's boss. *Id.* 0:53–1:37. Weidemann instructed Howard to lean forward and removed the handcuffs. *Id.* 1:37–2:22.

Howard rested upright on the edge of the back seat, facing out, and voiced displeasure with being pulled over. *Id.* 2:22–4:00. Eventually, Howard began to stand up, but Weidemann told him to remain seated so that he could perform a horizontal-gaze nystagmus test. Howard struggled to follow Weidemann's instructions and was unable to

5

complete the test. Weidemann instructed Howard to sit back inside the car, and Howard complied. Weidemann again asked Howard if he had any medical conditions, and Howard responded that he did not. *Id.* 4:00–5:28.

Meyer arrived less than two minutes later. ECF No. 37-5 at 0:15–2:28. With Howard sitting upright in the back seat, Weidemann administered a "breathalyzer" test. Howard blew three times into the breathalyzer device but failed to provide a testable breath sample. *Id.* 2:30–4:30. Weidemann eventually captured a "manual" breath sample that detected no alcohol. ECF No. 37-2 at 2. Weidemann asked Howard if he would return to his own vehicle and remain there while Weidemann completed necessary paperwork, and Howard agreed. Howard stepped out of the squad car on his own, and Officer Meyer accompanied Howard to his car. Howard stood next to his car while Weidemann finished preparing a citation. ECF No. 37-4 at 4:40–10:50. Weidemann printed the citation and handed it to Howard, informing him that he was receiving a speeding citation for "43 in a 30." He told Howard that the citation was for "tribal court." *Id.* 10:47–11:35. Weidemann wished Howard a good day and drove away. *Id.* 11:41–59.

Howard filed this lawsuit against Weidemann and Meyer in April 2020, asserting Fourth Amendment claims for excessive force and unreasonable seizure under 42 U.S.C. § 1983.[2] *See* Compl. [ECF No. 1]. Howard contends that Defendants' actions caused him

---

[2]   Howard also asserted tort claims of battery and false arrest. Those claims were dismissed without prejudice after the United States was substituted as a defendant under 28 U.S.C. § 2679(d) and certified, as to those claims only, that Defendants acted within the scope of federal employment through a "638 contract"—a funding agreement between the White Earth Band and the Bureau of Indian Affairs. ECF Nos. 27, 27-1, 31, 49.

to suffer physical and emotional injuries for which he has incurred medical bills, including aggravation of a torn rotator cuff, bruising around both of his wrists, and extreme pain. *Id.* ¶¶ 69–73.

II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255 (citation omitted).

Defendants advance two grounds for summary judgment on Howard's § 1983 claims. First, Defendants say there is no genuine dispute that they acted under color of tribal law, and not under color of state law. Mem. in Supp. at 11–21 [ECF No. 34]. Second and alternatively, Defendants contend that the undisputed video evidence establishes their entitlement to qualified immunity. *Id.* at 21–39. Both arguments are persuasive.

A

"Section 1983 imposes liability for certain actions taken 'under color of' law that deprive a person 'of a right secured by the Constitution and laws of the United States.'" *Dossett v. First State Bank*, 399 F.3d 940, 947 (8th Cir. 2005) (citation omitted). "Generally speaking, a public employee acts under color of law when he 'exercise[s] power

7

possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Johnson v. Phillips*, 664 F.3d 232, 239–40 (8th Cir. 2011) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)). This element "is satisfied if the defendant acts or purports to act in the performance of official duties, even if he oversteps his authority and misuses power." *Id.* at 240. "As the purpose of 42 U.S.C. § 1983 is to enforce the provisions of the fourteenth amendment, it follows that actions taken under color of tribal law are beyond the reach of § 1983, and may only be examined in federal court under the provisions of the Indian Civil Rights Act." *Coleman v. Duluth Police Dep't*, No. 07-cv-473 (DWF/RLE), 2009 WL 921145, at *23 (D. Minn. Mar. 31, 2009) (collecting cases), *aff'd*, 371 F. App'x 712 (8th Cir. 2010).

      Howard has not created a trial-worthy dispute that Defendants acted under color of state law. Defendants were tribal police officers vested with authority to enforce the tribal code, and that's what they did here. Weidemann attempted a traffic stop after forming a belief that Howard, an enrolled member of the White Earth Band of Ojibwe, was driving above the posted speed limit. When Howard failed to pull over and was noncompliant, Weidemann detained him to investigate whether he had driven under the influence of alcohol or other drugs. Speeding, noncompliance, and driving while impaired are violations of the White Earth Traffic Code. *See* Weidemann Decl. ¶¶ 8–12 [ECF No. 35]; *see also* White Earth Traffic Code § 5 (noncompliance with lawful order or direction of officer authorized to enforce the Code), § 11 (driving faster than posted speed limit), § 29 (driving, operating, or physically controlling motor vehicle under the influence of alcohol or controlled substance), *available at* https://whiteearth.com/divisions/judicial/forms.

Weidemann concluded the stop by issuing Howard a citation for speeding in violation of that Code. *See* ECF No. 37-3.

Citing a cooperative law enforcement agreement between the White Earth Reservation of Chippewa Indians and Becker County, Howard argues that some doubt exists as to whether Defendants acted under color of state law. This is not persuasive. Howard is correct that Weidemann and Meyer were capable of wearing multiple hats: they could enforce tribal law, but they were also authorized to enforce state criminal law on the reservation. ECF No. 39-3; *see* Minn. Stat. § 626.93. Howard also highlights the written citation he received, which references the "State of Minnesota" and identifies "Becker County" as the "prosecutor." ECF No. 37-3. "Assuming" that Weidemann was unaware of Howard's enrollment status, Howard reasons, Weidemann may have falsely "appeared," "claimed," or "purported" to act under state law by investigating and seizing Howard. Mem. in Opp'n at 19–20 [ECF No. 54]. Here, the evidence establishes beyond genuine dispute that Defendants acted only as tribal—and not as state—officers. Defendants presented themselves as tribal officers. They wore tribal police uniforms and drove marked White Earth Tribal Police Department vehicles. *See, e.g.*, ECF No. 37-7 at 0:05–23. Weidemann identified himself as an officer with the "White Earth P.D." ECF No. 37-2 at 0:42–45; ECF No. 37-3 at 1:20–30. At no time did Defendants invoke their state-law authority or threaten Howard with enforcement of state law. *See McDonough v. Toles*, 476 F. Supp. 3d 882, 889 (D. Minn. 2020). Howard voiced his disapproval of the White Earth Tribal Police Department throughout the stop, showing his own awareness of the source of Defendants' enforcement authority. Weidemann issued Howard a citation for violating the

9

White Earth Traffic Code and informed Howard that the citation was for "tribal court." ECF No. 37-4 at 11:10–20.[3] There is no genuine dispute that Defendants acted under color of tribal (not state) law, and they are entitled to summary judgment on that basis.

B

If a reasonable jury could conclude that Defendants acted under color of state law, Defendants would be entitled to summary judgment on qualified immunity grounds. In resolving a claim of qualified immunity, a court must ask: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (citations omitted). "Courts, in their sound discretion, may consider the questions in either order, but a [] plaintiff can defeat a claim of qualified immunity only if the answer to both questions is yes." *Johnson v. Courtois*, No. 17-cv-3608 (ECT/DTS), 2018 WL 6726892, at *6 (D. Minn. Dec. 21, 2018) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "The party asserting the defense of qualified immunity has the burden of establishing the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all

---

[3] In his declaration, Weidemann attests that he listed "Becker County" in the citation's "prosecutor" field because of a software limitation and because the incident occurred there (within the White Earth Reservation). Weidemann Decl. ¶¶ 22–24. The citation was prosecuted in White Earth Nation Tribal Court by a lawyer for the White Earth Nation. Howard appeared at a hearing during that prosecution and later agreed to a continuance that led to dismissal of the charge. *See* ECF Nos. 40, 40-1–40-6.

reasonable inferences." *McGuire v. Cooper*, 952 F.3d 918, 922 (8th Cir. 2020) (cleaned up).

Howard asserts two distinct (but related) Fourth Amendment deprivations. First, he makes an "unreasonable seizure" claim, challenging both the basis for and duration of his seizure. He argues that Defendants lacked a reasonable suspicion of criminal activity to detain him in the first place, and that they unreasonably prolonged his detention. Mem. in Opp'n at 20–23. Second, Howard asserts that Defendants "inflicted unconstitutional, excessive, and unreasonable force upon [him] for a mere speeding ticket." Mem. in Opp'n at 23. After handcuffing him, Howard says, Weidemann "stuffed" him into the back of a police car and, "[i]n doing so, he tore [] Howard's jeans pocket and caught him on the shoulder straps on the back seat," which "aggravated" a preexisting, chronic tear in his rotator cuff. *Id.* at 25.

Start with Howard's unreasonable seizure claim. To conduct an investigatory stop, a "police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" it. *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *accord Phillips*, 664 F.3d at 237. "Law enforcement officers are entitled to evaluate the totality of the circumstances in deciding whether reasonable suspicion is present, and they may possess reasonable suspicion even when innocent explanations can be put forward for each individual circumstance." *United States v. Reddick*, 910 F.3d 358, 361 (8th Cir. 2018). "[I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional

11

information." *Hayes v. Florida*, 470 U.S. 811, 816 (1985). An officer may make "reasonable inquiries aimed at confirming or dispelling the suspicion." *United States v. Williams*, 796 F.3d 951, 957 (8th Cir. 2015) (citations omitted). "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'–to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citation omitted). "A delay that prolongs . . . the stop to conduct investigatory actions unrelated to the purposes of the stop is impermissible unless it is supported by reasonable suspicion." *United States v. Sanchez*, 955 F.3d 669, 674 (8th Cir. 2020) (cleaned up).

Weidemann articulated specific facts constituting a reasonable suspicion to detain Howard in his report, ECF No. 37–2, and the video evidence substantiates Weidemann's report. Weidemann began with a reasonable suspicion to conduct a traffic stop after he observed Howard's vehicle traveling faster than the posted speed limit.[4] *E.g.*, *United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007). Howard's subsequent conduct plainly gave Weidemann a sufficient basis to detain him and to expand the stop's purpose to investigate whether Howard was driving while impaired. Howard failed to pull over and drove more than one minute with Weidemann following him in a marked vehicle and with sirens and emergency lights activated. ECF No. 35-2 at 0:00–1:23. After parking his car, Howard did not respond to Weidemann's commands and twice began walking away from him.

---

[4]   Howard contends that Weidemann lacked objective evidence that he was speeding. Mem. in Opp'n at 2, 21, 24. Not so. Weidemann's body-camera video confirms that the radar mounted in his squad car displayed a reading of 43 miles-per-hour when Weidemann conducted the stop. ECF No. 38-3 at 6; *see, e.g.*, ECF No. 35-2 at 3:59–5:02.

Howard acted disoriented and seemed unable to comprehend the significance of the interaction. *Id.* 1:23–33. Though Howard's erratic behavior may have stemmed in part from his hearing impairment, that wasn't clear from the interaction, and Weidemann did not have to eliminate all "innocent explanations" for Howard's conduct before detaining him. *Reddick*, 910 F.3d at 361. Owed largely to Howard's noncompliance, the stop's duration—almost 27 minutes—was also objectively reasonable. Weidemann's decision to handcuff Howard and place him inside the squad car was necessitated by Howard's refusal to obey legitimate orders and to remain in his car. While seated in the back seat of Weidemann's squad car, Howard volunteered that he had been drinking and that he would "like to take a test on that." ECF No. 37-2 at 6:20–50. Defendants acted diligently to run a check on Howard's license, determine whether he was under the influence of alcohol or other substances, and issue him a citation for speeding. *See, e.g.*, *Waters v. Madson*, 921 F.3d 725, 737 (8th Cir. 2019).

Next is Howard's excessive force claim. "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *City of Golden Valley*, 574 F.3d at 496 (citations and internal quotation marks omitted). "Whether the force used was reasonable depends on such circumstances as the severity of the crime, whether the suspect posed a threat, and whether the suspect was resisting arrest."

13

*Binion v. City of St. Paul*, 788 F. Supp. 2d 935, 946 (D. Minn. 2011). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. "Once the predicate facts are established, the reasonableness of the official's conduct under the circumstances is a question of law." *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 989 (8th Cir. 2009).

The video evidence eliminates any doubt that Defendants acted with objectively reasonable force. As noted, Weidemann acted with a reasonable suspicion that Howard was speeding and had driven his car while impaired. As a result, Weidemann could use "some degree" of force to affect a seizure that would enable him to conduct a reasonable investigation. The force Weidemann used was minimal. After Howard walked away against Weidemann's verbal commands, Weidemann took hold of Howard's coat and led him back to Weidemann's squad car by Howard's left arm. ECF No. 35-2 at 1:37–46. Howard resisted Weidemann's efforts to handcuff him, jerking his arm away suddenly. *Id.* 1:47–2:03. Once secured in handcuffs, Howard never complained they were too tight. Weidemann placed Howard in the back of his squad car while he investigated because he was "the only officer on scene" and reasonably believed that doing so was necessary to keep Howard from fleeing. Weidemann Decl. ¶¶ 16–17. Howard never complained that he was in pain, and afterwards he appeared to move around quite comfortably. Defendants allowed Howard to stand outside unhandcuffed for nearly seven minutes while Weidemann prepared the written citation. ECF No. 37-7 at 2:51. Under these circumstances, there is

14

no genuine dispute that Defendants' actions were objectively reasonable. Howard cannot establish a violation of his constitutional rights, making the entry of summary judgment alternatively appropriate on this basis.[5]

### III

In his memorandum opposing Defendants' motion for summary judgment, Howard tries to assert new claims under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *See* Mem. in Opp'n at 18–19. Howard considers his *Bivens* theory an alternative to his claims under section 1983. *See id.* at 18 ("Assuming . . . Defendants' Chapter 638 status precludes conduct under color of state law, then they acted under color of federal law."). Howard did not plead *Bivens* claims, but he contends that, by alleging facts to support a violation of his Fourth Amendment rights, he gave Defendants "adequate notice" of *Bivens* claims. *Id.* at 19. Defendants take the position that Howard's *Bivens* claims were not pleaded and are untimely, and that considering them would be unfairly prejudicial. Howard's Complaint, they point out, asserted only Fourth Amendment violations "through 42 U.S.C. § 1983," and Howard alleged that Defendants acted as "agents of Becker County"—*not* as agents of the federal government. Reply Mem.

---

[5]  The video evidence also establishes—and Howard concedes—that Meyer never touched him during the encounter. *See* ECF No. 39-2 at 4; ECF 37-7. Because Weidemann did not use unreasonable force, Howard's excessive force claim against Meyer also fails as a matter of law. *See McManemy v. Tierney*, 970 F.3d 1034, 1039 (8th Cir. 2020) ("[A]n officer who fails to intervene to prevent the *unconstitutional* use of excessive force by another officer may be held liable for violating the Fourth Amendment. But there is no duty to prevent the use of *reasonable* force." (internal citations omitted)).

at 4–9 [ECF No. 60]. Howard's allegations, they argue, did not give fair notice of his intention to invoke *Bivens*.

Federal Rule of Civil Procedure 8(a)(2) requires that pleadings contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Notice pleading serves "to give the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved." *N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1056–57 (8th Cir. 2004) (citation omitted). "[T]he pleading requirements under the Federal Rules are relatively permissive, [but] they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment." *Id.* at 1057; *accord Wendt v. Iowa*, 971 F.3d 816, 821 (8th Cir. 2020). Defendants are "not required to intuit additional theories of liability that were not apparent from [the] complaint." *WireCo WorldGroup, Inc. v. Liberty Mut. Fire Ins. Co.*, 897 F.3d 987, 993 (8th Cir. 2018).

Broadly construed, Howard's Complaint did not give fair notice of the *Bivens* claims he now asserts. *Bivens* is an implied remedy what would require Howard to prove that Defendants acted under color of federal law. 403 U.S. at 389. Howard did not reference a *Bivens* claim, did not allege that Defendants acted under color of federal law, and did not allege facts suggesting he might raise a *Bivens* claim. Howard seeks to tether his *Bivens* claims to a fact that is conspicuously absent from the Complaint: the existence of a 638 contract between the White Earth Band and Bureau of Indian Affairs. Mem. in Opp'n at 18–19. Though aware of the contract—Defendants appear to have produced it with their initial disclosures, *see* ECF No. 39-5 at 2; *see also* ECF No. 56 at 37–40 (appearing to list

funding estimates for 2018 under the contract)—Howard did not seek to amend his Complaint. Howard also relies on *Johnson v. City of Shelby*, 574 U.S. 10 (U.S. 2014) (per curiam), but that case doesn't change things. There, summary judgment was entered against plaintiffs who failed to cite 42 U.S.C. § 1983 in a complaint seeking damages for violations of their Fourteenth Amendment due process rights. The Supreme Court reversed, holding that Rule 8 does not require plaintiffs "seeking damages for violations of constitutional rights to invoke § 1983 expressly in order to state a claim." *Id.* at 11. Howard's pleading deficiencies here are more fundamental. Beyond mislabeling or omitting the source of a claim (which Howard also did), he selected *different* claims predicated on *different* facts. Howard couched his Fourth Amendment claims in reference to 42 U.S.C. § 1983 and in allegations that Defendants were agents of Becker County or the State of Minnesota. *See* Compl. ¶¶ 1, 48–49, at 9–10. He did *not* allege that Defendants acted under color of federal law. Unlike in *Johnson v. City of Shelby*, a technical amendment to the Complaint would not cure Howard's pleading deficiencies. Howard would need to amend the Complaint to include basic factual allegations underpinning his *Bivens* claims. At minimum, Defendants would be entitled to re-open discovery and an opportunity for additional dispositive motion practice. Defendants would incur additional costs and suffer prejudice if forced to defend claims Howard "articulated for the first time long after the close of discovery." *Gerhardson v. Gopher News Co.*, No. 08-cv-537 (JRT/JJK), 2010 WL 3463495, at *8–9 (D. Minn. Aug. 30, 2010). In sum, Howard's Complaint did not provide fair notice of the *Bivens* claims raised in his memorandum in opposition to Defendants' summary-judgment motion, and Howard will not be permitted

to avoid the entry of summary judgment against his § 1983 claims by substituting *Bivens* claims in their place.[6]

## ORDER

Accordingly, based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendants' Motion for Summary Judgment [ECF No. 32] is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  December 22, 2021               s/ Eric C. Tostrud
                                        Eric C. Tostrud
                                        United States District Court

---

[6] It's highly doubtful that Howard could advance triable *Bivens* claims. "[A]nalysis of qualified immunity with respect to *Bivens* claims is the same as it is with respect to § 1983 claims." *Mountain Pure, LLC v. Roberts*, 814 F.3d 928, 932 n.2 (8th Cir. 2016). In other words, the determination that qualified immunity would bar Howard's § 1983 claims almost certainly means any *Bivens* claims also would be barred.